**SHO–PRO OF INDIANA, INC.,**
**Appellant–Plaintiff Below,**

v.

**Roger J. BROWN, Appellee–**
**Defendant Below.**

No. 18A05–9107–CV–230.[1]

Court of Appeals of Indiana,
Third District.

Feb. 11, 1992.

to correctly apply the laws our legislature has enacted.

1. This case was diverted to this office by order of the Chief Judge.

Howard Howe, Indianapolis, for appellant-plaintiff.

STATON, Judge.

Sho–Pro of Indiana, Inc. (Sho–Pro) appeals a negative judgment entered in favor of Roger J. Brown, raising two issues for our review, which we restate as follows:

I. Whether the trial court erred in finding that there was no binding contract between the parties.

II. Whether the trial court erred in finding that, even if there was a binding contract between the parties, such contract was unconscionable and therefore unenforceable.

We affirm.

The evidence most favorable to the judgment reveals that representatives of Sho–

Pro visited the residence of Roger J. Brown in order to sell him replacement windows. They obtained Brown's name through a "lead card" obtained as a result of Brown's entry in a "sweepstakes contest" to win a house full of windows or $500, with no obligation. The entrant was also entitled to a "turkey platter" merely for entering. After a four-to-five-hour sales pitch, Brown signed a number of documents and received a tin platter.

Three days later, a representative of Sho–Pro left a card in Brown's door. Upon contacting Sho–Pro and inquiring about the card, he was informed by the woman who answered the phone that he had purchased four (4) replacement windows on credit for $4,322. Brown protested that he did not purchase any windows, that he could not afford $4,322, and that he did not even own the house in which he resided. The woman then told him that there would be no problem and that the order would be stopped.

No windows were ever installed, but a week or two later a representative of Sho–Pro arrived to measure windows. When Brown again protested that he did not order any windows, the representative assured him that he was not measuring because Brown was buying the windows, but in case Brown changed his mind about the windows or someone else moved into the house. On that basis, Brown assented to the measurements. He also signed a document stating that the man had been to his house because the man said he needed Brown's signature in order to get paid for the work.

The matter was next called to Brown's attention when he received a copy of the complaint instituting this action to collect the contract price, attorneys fees, and pre-judgment interest. The case was tried to a judge, who entered findings of fact concluding that there was no contract between the parties, and even if there was a contract, the bargaining process rendered the contract unconscionable and therefore unenforceable. Judgment was entered in favor of Brown and Sho–Pro appeals.

The trial court entered findings of fact and conclusions of law, *sua sponte* on some but not all issues litigated. When this occurs, two separate and distinct standards of review are applied to the judgment of the trial court. A general judgment standard of review is applied to those issues not supported by findings of fact. Issues supported by findings of fact are treated differently on review. *In Re Marriage of Snemis* (1991), Ind.App., 575 N.E.2d 650, 653. On those issues where the court has entered findings, we employ the following standard of review: we first must determine whether the evidence supports the findings; then determine whether the findings support the judgment. *Kaminszky v. Kukuch* (1990), Ind.App., 553 N.E.2d 868, 870, *trans. denied.* The judgment of the trial court will be affirmed if we conclude that the special findings support the judgment and are not clearly erroneous. *Brancheau v. Weddle* (1990), Ind.App., 555 N.E.2d 1315, 1317. A judgment is clearly erroneous where a review of the record leaves us with a firm conviction that a mistake has been made. *Indiana Dept. of Correction v. Stagg* (1990), Ind.App., 556 N.E.2d 1338, 1341, *trans. denied.*

## I.

### Contract

Sho–Pro argues that Brown's defense that he misunderstood the transaction is not a defense under Indiana law. He argues that the parol evidence rule prevents the trial court from examining the circumstances surrounding the transaction, and that "there is not even a scintilla to support the conclusion that Roger Brown didn't know what he was doing." Appellant's brief, p. 14.

Initially, we note that Sho–Pro's argument regarding the parol evidence rule lacks merit. The plain language of the Uniform Commercial Code requires a writing "intended by the parties as a final written expression of their agreement" before the rule becomes applicable. Ind.Code

26–1–2–202 (1988). Simply stated, the rule presumes a valid written contract between the parties. *See Warrick Beverage Corp. v. Miller Brewing Co.* (1976), 170 Ind.App. 114, 352 N.E.2d 496, 501. The question whether a document has been assented to by the parties as a complete expression of their intent is an ordinary question of fact, and no relevant evidence on this question is excluded on the mere ground that it is offered in the form of oral testimony. Corbin, *Corbin on Contracts*, §§ 573–596 at 535 (One Volume ed. 1952). No evidence was introduced here purporting to vary the terms of the written document offered; rather, the question was whether there was a meeting of the minds between the parties. The parol evidence rule has no application here.

 The expressions contained in a document purporting to be a sales contract require a meeting of the minds, the absence of which prevents the formation of a contract. *Continental Grain Co. v. Followell* (1985), Ind.App., 475 N.E.2d 318, 321 *transfer denied.* The intention of the parties is a factual matter to be determined by the trier from all of the circumstances, and a party relying on an express contract bears the burden of proving its existence. *Id.* Where there is probative evidence to support the conclusion that there was no meeting of the minds between the parties, we will not disturb that conclusion. *Id.*

 Here, the evidence reveals that Brown did not read the documents he signed. Moreover, there was evidence that he misunderstood the purpose of the documents:

Q. Why did you sign those documents if you couldn't afford the windows? Why did you sign the different documents that you signed?

A. One of them was for the day they came out to my house and showed me a demonstration. That they personally come [sic] to my home. I was at my residence and they performed a demonstration.

Record, p. 37. Thus, Brown testified that he thought he was signing a document certifying that the salesmen had performed a demonstration for him. In addition, Brown personally told two employees of Sho–Pro that he did not intend to buy replacement windows, and was twice assured that he had incurred no obligation. These facts support an inference that Brown had never intended to incur an obligation to purchase the windows.

 Sho–Pro argues that Brown had to have known that he was applying for windows because he applied for financing. However, the record reveals that he did not fill out the financing form, but was asked a number of questions regarding the ownership of his house and his debts in the course of the "demonstration". He merely signed the document where he was told. Even if he had filled out the financing form, it would not necessarily follow that he had agreed to purchase the windows. Parties to sales transactions often secure financing before they agree to go through with the transaction—the real estate sales industry is just one such example.

We conclude that there was probative evidence to support the trial court's finding that there was no meeting of the minds between Brown and Sho–Pro, and we cannot say that the findings on the issue were clearly erroneous. Accordingly, the trial court did not err in concluding that there was no binding contract between the parties.

## II.

### Unconscionability

 We have held above that the trial court did not err in concluding there was no binding contract between the parties. Nonetheless, we will also address Sho–Pro's arguments concerning the trial court's finding on the unconscionability issue. Sho–Pro essentially argues that there was no evidence to support the trial court's finding of unconscionability.

Indiana Code 26–1–2–302 provides in relevant part:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

Our supreme court has defined an unconscionable contract to be one which no sensible man not under delusion, duress or in distress would make, and such as no honest and fair man would accept. *Weaver v. American Oil Co.* (1971), 257 Ind. 458, 276 N.E.2d 144, 146, *reh'g denied.* *Weaver* also stands for the proposition that a contract may be declared unconscionable when there is a great disparity in bargaining power which leads the party with the lesser power to sign a contract unwillingly or unaware of its terms. *Id.; Dan Purvis Drugs, Inc. v. Aetna Life Ins.* (1980), Ind. App., 412 N.E.2d 129, *transfer denied.* Finally, the trial court also made reference to the statutory provisions on unconscionability of home improvement contracts:

> For the purposes of this chapter, a home improvement contract is unconscionable if an unreasonable difference exists between the fair market value of the services, materials, and work performed or to be performed and the home improvement contract price.

IC 35–43–6–8.

The evidence here reveals that Brown responded to a contest which purported to award a free "house full of windows" or $500 and promised a "turkey platter" while the contestant incurred "no obligation." In return, Brown was subjected to a four-to-five-hour "demonstration" of the replacement windows conducted by two Sho–Pro representatives, including an inquiry into his financial background. He assumed after the demonstration that he did not order any windows, only to later find out that he had purchased four replacement windows at a price of $4,322. The sales contract was prepared by Sho–Pro and filled out by representatives of Sho–Pro. Brown did not read the contract before signing it and did not read any of the "fine print" on the back. The evidence also reveals that the windows cost Sho–Pro a total of $1,080.50. The remaining $3,241.50 was assigned as "lead costs" of $432.20, "sales management costs" of $600.61, "administrative costs" of $379.99, sales commissions of $648.30, and profit of $648.30.[2] Sho–Pro's president was cross-examined at length regarding his justification for these various costs.

We cannot conclude that the trial court was clearly erroneous in finding elements of unconscionability in both the circumstances surrounding the signing of the contract and the contract price. Upon finding that the contract (if a contract existed) was unconscionable, the trial court could decline to enforce it. *Weaver, supra,* at 148. We find no error.

The judgment of the trial court is in all respects affirmed.

GARRARD, J., concurs.

HOFFMAN, J., concurs in result and files separate opinion.

HOFFMAN, Judge, concurring in result.

I concur in result on the basis that the contract with Sho–Pro was unconscionable. The evidence not only demonstrated that the contract was unconscionable, but that the contract was void due to fraud and misrepresentation on the part of Sho–Pro.

---

**2.** These figures total $3,789.90. Presumably, the remaining $532.10 would represent the installation costs for the four windows (the windows were never delivered nor installed).