**McGRAW–EDISON COMPANY,**
**Appellant–Defendant,**

v.

**NORTHEASTERN RURAL ELECTRIC**
**MEMBERSHIP CORPORATION,**
**Appellee–Plaintiff.**

No. 35A04–9310–CV–383.

Court of Appeals of Indiana,
Fourth District.

Feb. 28, 1995.

---

Richard E. Steinbronn, D. Randall Brown, Barnes & Thornburg, Fort Wayne, for appellant.

Peter L. Obremskey, Alan D. Hutchinson, Parr Richey Obremskey & Morton, Lebanon, Stanley H. Matheny, Matheny, Michael, Hahn & Bailey, Huntington, for appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

This is an interlocutory appeal from the denial of Appellant–Defendant McGraw–Edison Company's (McGraw–Edison) motion for partial summary judgment.

We affirm.

### ISSUE

The issue certified for appeal is whether a limitation of liability clause contained in a purchase agreement negotiated between commercial entities that limits potential liability for all claims, including product liability claims, is enforceable.

### FACTS AND PROCEDURAL HISTORY

This case involves the purchase by buyer from seller of an automatic recloser which allegedly failed to prevent an electrical surge from reaching a power transformer resulting in damage to the buyer's property.[1]

Plaintiff–Appellee Northeastern Rural Electric Membership Corporation (Northeastern) is in the business of providing electric service in Whitley, Allen, Huntington, Wabash, Kosciusko and Noble counties. As a result of Northeastern's long-range plan to fulfill the needs of consumers in the southwestern portion of Allen County, a substation was built in Coventry. Northeastern solicited a bid from McGraw–Edison through Dynalectric Supply Company, a McGraw–Edison distributor. On behalf of McGraw–Edison, Dynalectric submitted a price quotation to Northeastern, which Northeastern thereafter accepted. The quotation accepted by Northeastern contained a limitation of liability provision, which purported to limit Northeastern's damages to the purchase price of the product.

The total purchase price of the automatic reclosers and accessories was $71,494. The reclosers were shipped by McGraw–Edison to Northeastern in 1979 and the Coventry substation began operating in December of 1981. McGraw–Edison was not involved in the installation of the substation equipment.

A fire resulting in damage to the Coventry substation occurred on January 30, 1982. The area surrounding the substation was struck by lightning and the fire was caused by an electrical surge. The exact cause of the surge is uncertain.

In January of 1984, Northeastern filed suit against McGraw–Edison for an alleged breach of the implied warranty of fitness for a particular purpose, negligence and liability under the Indiana Strict Product Liability Act. The present claim against McGraw–Edison is brought exclusively under the Indiana Strict Product Liability Act.[2] Northeastern alleges that a design defect in McGraw–Edison's VSAT recloser plugs prevented the recloser from acting as a 'breaker', and allowed a power surge to reach the transformer in the Coventry substation.[3]

---

1. Northeastern alleges estimated damages in excess of $750,000, about $400,000 of which was calculated at the time of appeal plus the uncalculated lost revenues.

2. The Act is codified at IND. CODE 33–1–1.5–1 through 33–1–1.5–8 (1993).

3. Specifically, the reclosers are comprised of separate devices called VSAT reclosers. The VSAT reclosers are designed to protect electric power

McGraw–Edison then moved for partial summary judgment seeking to enforce the limitation of liability provision and thus limit Northeastern's potential damages to the purchase price of the alleged defective recloser and accessories. In support of its motion, McGraw–Edison relied principally on the limitation of liability provision contained in the contract.

After hearing argument on the motion, the trial court denied McGraw–Edison's motion. McGraw–Edison petitioned for leave to take a permissible interlocutory appeal. Northeastern thereafter joined in the petition. We granted the petition for interlocutory appeal and subsequently heard oral argument.

## DISCUSSION AND DECISION

### Standard of Review

Before reaching the merits of this appeal, we recite the familiar standard of review by which we review the denial of motions for summary judgment. When reviewing the trial court's ruling on a motion for summary judgment, this court applies the same standard as the trial court. *American Family Mut. Ins. Co. v. Dye* (1994), Ind.App., 634 N.E.2d 844, 846, *reh'g denied, trans. denied.* Thus, no deference is given to the trial court's judgment. *Foreman v. Jongkind Bros., Inc.* (1994), Ind.App., 625 N.E.2d 463, 467, *reh'g denied.*

Summary judgment is appropriate if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). When the parties do not dispute the facts material to the claim, our task is to determine whether the trial court correctly applied the law to the undisputed facts. *O'Neal v. Throop* (1992), Ind.App., 596 N.E.2d 984, 986, *trans. denied.*

### Product Liability

The issue before the trial court and the issue before us is whether, as a matter of law, the contract entered into by McGraw–Edison to manufacture and deliver the automatic recloser to Northeastern limits McGraw–Edison's potential liability to the purchase price of the recloser and accessories. Whether a limitation of liability clause to strict liability claims is enforceable under the Strict Product Liability Act is an issue of first impression in Indiana. Resolution of this issue requires consideration of both the policy goals behind the Strict Product Liability Act and the notion of contractual freedom.

McGraw–Edison contends that the trial court erred in denying its motion for partial summary judgment. Specifically, it argues that Indiana law permits commercial entities to contractually limit potential liability under the Strict Product Liability Act. In support of this argument, it relies on general principles of common law, public policy, the absence of any express prohibition in the Act and section 2–719 of Article 1, Chapter 2 of the Uniform Commercial Code (UCC).[4] I.C. 26–1–2–719.

It is undisputed that McGraw–Edison specified in its quotation to Northeastern for the purchase of the recloser that the offer to sell was subject to the standard terms and conditions. It is further undisputed that Northeastern accepted such terms and conditions which provided that McGraw–Edison's liability under any claim of any kind would be limited to the purchase price of the equipment sold pursuant to the contract. The quotation submitted by McGraw–Edison, through its distributor Dynalectric Supply Company, concluded by stating that "[t]his quotation is subject to the terms and conditions listed on the reverse side of all three pages contained in this letter." (R. 163). The following section captioned "Limitation of Liability" was provided with the quotation:

> Seller's liability for any claim of any kind shall not exceed the purchase price of equipment, or portion thereof, which gives rise to the claim, whether such claim shall be for breach of contract, breach of warranty or negligence and whether such

transformers from surges by dissipating the electrical surges before they reach a transformer.

4. The Uniform Commercial Code on Sales is codified at I.C. 26–1–2–101 through 26–1–2–725 (1993). Citations will refer to the Indiana Code section.

claim arises out of or results from this contract, or from the design, manufacture, sale, delivery, resale, installation, technical direction of installation, inspection, repair, operation or use of any equipment furnished under this contract. Seller shall not be liable in any event for special or consequential damages including, but not limited to, loss of profits or revenue, loss of use of the equipment or any associated equipment, cost of capital, cost of substitute equipment, facilities or services, downtime costs, or claims of customers of Purchaser for such damages.

(R. 166).

In denying summary judgment, the trial court said that the theory of strict liability which is governed by the Indiana Strict Product Liability Act "is one of two distinct theories available to [Northeastern] and is a distinct remedy from any contractual claims it might have raised." (R. 274–75). The trial court relied on *B & B Paint Corp. v. Shrock Mfg., Inc.* (1991), Ind.App., 568 N.E.2d 1017, *trans. denied,* and concluded that "[a]s a distinct legal theory, the rules of the Uniform Commercial Code, including those relating to limitation of liability, are inapplicable." (R. 275). We agree.

In *B & B Paint,* the issue certified for interlocutory appeal was whether buyer's complaint alleging UCC theories was governed by the Code four-year statute of limitations or the Strict Product Liability Act two-year statute.[5] *B & B Paint,* 568 N.E.2d 1017. We concluded that buyer was entitled to bring its claim under whatever theory of liability applicable, whether it be the Uniform Commercial Code or the Strict Product

Liability Act. *Id.* We further said that actions brought under the Strict Product Liability Act and the UCC "represent two different causes of action ... [t]he Product Liability Act governs product liability actions in which the theory of liability is negligence or strict liability in tort, while the UCC governs contract cases which are based on breach of warranty." *Id.* at 1020.

McGraw–Edison relied primarily on this court's decision in *Martin Rispens & Son v. Hall Farms, Inc.* (1992), Ind.App., 601 N.E.2d 429, which held that when the terms of a contract are clear and unambiguous and the parties' intentions are apparent, the parties may limit liability under strict product liability claims. However, the Indiana Supreme Court vacated this opinion on transfer but did not reach the limitation of liability issue. *Martin Rispens & Son v. Hall Farms, Inc.* (1993), Ind., 621 N.E.2d 1078, *reh'g denied.*

In *Martin Rispens,* the buyer of watermelon seeds brought suit against the producer and dealer for breach of express warranty, strict liability and negligence. After concluding that the buyer advanced viable theories of recovery, the extent to which the buyer could recover damages, assuming liability was ultimately established, was addressed.

In *Martin Rispens,* we were faced with a written limitation of liability provision similar to the clause we are asked to interpret today. Both producer and dealer's contracts with buyer contained clauses limiting their potential liability to the purchase price of the goods involved, which were watermelon seeds.[6]

---

**5.** In *B & B Paint,* the buyer purchased paint from seller and buyer's plant caught fire which buyer attributed to the paint. Buyer suffered property damage as a result of the fire and filed suit against seller alleging breach of the implied warranty of merchantability and breach of the implied warranty of fitness for a particular purpose. Seller moved for summary judgment arguing that the action was a product liability action and thus governed by the two-year statute of limitations in the Act, as opposed to the four-year statute in the UCC. The trial court denied the motion holding that the complaint was timely filed within the UCC four-year statute. 568 N.E.2d 1017.

**6.** The seed producer's label was clearly labeled limitation of liability and stated that "[p]urchaser's exclusive compensation for loss or damage arising from purchase or use of seed ... shall be limited to an amount equal to the purchase price of the seed.... This limitation of liability shall be applicable to any claims presented ... *regardless of the legal theory forming the basis of such claim,* and whether such theory involves negligence, contractual liability or otherwise." *Martin Rispens,* 601 N.E.2d at 441–42. The seed dealer's order form plainly stated that "[its] liability, in all instances, is limited to the purchase price of the seed." *Id.* at 442.

We held that the sellers had effectively limited liability to the purchase price of the seed whether the theory of recovery was tort or contract. We said that even though the case involved tort theories, "[b]ecause [the] litigation stems from a buyer's dissatisfaction with a purchased product, it is governed in large part by the sales provisions of the Uniform Commercial Code." *Martin Rispens,* 601 N.E.2d at 441. We then analyzed the limitation of liability clause under general principles of contract law, concluding that the sellers' intent to limit liability to the purchase price of the seed was effective, unambiguous, substantively and procedurally conscionable and did not fail of its essential purpose. *Id.*

On transfer to the Indiana Supreme Court, the buyer argued that our decision improperly applied UCC provisions to actions based in tort. The sellers responded that where the only losses are economic, commercial entities are free to contractually limit liability. As previously alluded to, the supreme court vacated our opinion; however the limitation of liability in tort claims issue was not reached because it was rendered moot. *Martin Rispens,* 621 N.E.2d at 1078. The issue that the supreme court declined to reach in *Martin Rispens* is the precise issue before us today.

We find *Reed v. Central Soya Co., Inc.* (1993), Ind., 621 N.E.2d 1069, *modified on reh'g* 644 N.E.2d 84, to be instructive on this issue. *Reed* was a case handed down contemporaneously with *Martin Rispens,* wherein our supreme court discussed how the liability imposed by section 402A of the Restatement (Second) of Torts (1965) is founded on tort rather than on contract. With regard to recovery of economic damages under the Act, the court held that "where the loss is solely economic in nature, as where the only claim of loss relates to the product's failure to live up to expectations, and in the absence of damage to other property or person, then such losses are more appropriately recovered by contract remedies." *Reed,* 621 N.E.2d at 1074–75. In discussing the justification of disallowing strict tort recovery for economic loss the court explained that "allowing a buyer to recover in tort where he has suffered only economic loss allows him to circumvent the

seller's effective limitation or exclusion of warranties under the UCC . . . ." *Id.* at 1075. UCC remedies do not apply to claims brought under the Act.

Northeastern's claim is governed by Indiana's Strict Product Liability Act which imposes strict liability in tort on one who places in the stream of commerce any product in a defective condition unreasonably dangerous to the property of a user or consumer. I.C. 33–1–1.5–3 (1993). Prior to the enactment of the Act, Indiana followed strict liability in tort as embodied in section 402A of the Restatement (Second) of Torts, which imposes liability on manufacturers and sellers for injuries caused by unreasonably dangerous products. The Act was passed by the legislature in 1978 and was nearly a verbatim codification of section 402A. The 1983 amendments to the Act changed the definition of "physical harm" to "bodily injury, death, loss of services, and rights arising from any such injuries, as well as sudden, major damage to property. The term does not include gradually-evolving damage to property or economic losses from such damage." I.C. 33–1–1.5–2 (1993).

When the legislature enacted the Strict Product Liability Act, it entered, occupied and preempted the field of strict product liability in tort. *Koske v. Townsend Engineering Co.* (1990), Ind., 551 N.E.2d 437, 442 (the Indiana open and obvious danger rule does not apply to strict liability claims under the Indiana Strict Product Liability Act). Because the Act is in derogation of the common law, it must be strictly construed.

In construing a statute, our foremost objective is to determine and give effect to the intent of the legislature. *See Amoco Production Co. v. Laird* (1993), Ind., 622 N.E.2d 912, 915. It is a rule of statutory construction that the legislature did not intend by statute to make any change in the common law beyond what it declares either in express terms or by unmistakable implication. *Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.* (1991), Ind., 578 N.E.2d 669, 673. Indeed, courts must presume the legislature is aware of the common law, and a statute will not be construed as changing the common law farther than the

import of its words. *Hinshaw v. Bd. of Comm'rs* (1993), Ind., 611 N.E.2d 637, 639; *see Connecticut Mut. Life Ins. Co. v. King* (1911), 47 Ind.App. 587, 597, 93 N.E. 1046, 1048.

■ Under the common law doctrine of strict product liability, a product manufacturer or seller was prohibited from disclaiming or limiting its liability by contract. *See Greeno v. Clark Equipment Co.* (N.D.Ind.1965), 237 F.Supp. 427, 428–29. We must presume from the absence of express language in the Strict Product Liability Act permitting a seller to limit its liability that the legislature did not intend to change the common law in that regard. *See Hinshaw*, 611 N.E.2d at 639; *Brad Snodgrass*, 578 N.E.2d at 673.

The legislature's intent in the Act is further disclosed by its inclusion of an indemnification provision but the omission of a limitation of liability provision. *See* I.C. 33–1–1.5–6. Indemnity clauses shift the financial burden of liability to the indemnitor without relieving the indemnitee of liability. *Cf. TLB Plastics Corp. v. Procter & Gamble Paper Co.* (1989), Ind.App., 542 N.E.2d 1373, 1376, *trans. dismissed* (obligation to indemnify does not arise until party seeking indemnity suffers loss or damage). The indemnity provision in the Strict Product Liability Act contemplates that when a party is found liable under the Act as a "seller" of a defective product, it may *recover* from "any other person whose actual fault caused a product to be defective." *Id.* Thus, the Act as written cannot be construed to permit a seller to limit its strict liability under the statute.

Finally, a careful examination of the policy reasons underlying the Act and section 402A is critical to a proper resolution of this case. Strict product liability in tort was created to insure that the manufacturers of defective products will be required to shoulder the burden of damages caused by placing unreasonably dangerous products in the stream of commerce and to alleviate this burden from the user or consumer. *See generally Cornette v. Searjeant Metal Products, Inc.* (1970), 147 Ind.App. 46, 258 N.E.2d 652 (wherein this court expressly adopted section 402A of the Restatement (Second) of Torts).

The Strict Product Liability Act is designed to further public policy by protecting consumers from unreasonably dangerous goods. To enforce a limitation of liability clause under the Act would defeat the purpose of the Act. Furthermore, I.C. 26–1–2–719, the concept of contractual exculpatory clauses and related tools for disclaiming liability are inapplicable to this case because it is based in product liability. In sum, the Act preempted the field of strict product liability in tort, and because the Act is silent on any means of contractually allocating liability, we cannot construe it to allow contractual limitations on liability where such limitations were invalid under the common law. Indemnification based on fault is addressed in the Act and had the legislature intended to provide for limitation of liability it would have done so. *See* I.C. 33–1–1.5–6.

If Northeastern had brought its claim under a contract or UCC theory, the limitation of liability provision might be enforceable, as competent parties are generally free to contract as they see fit. *See Martin Rispens*, 621 N.E.2d at 1085; *Weaver v. American Oil Co.* (1971), 257 Ind. 458, 463, 276 N.E.2d 144, 147. However, because Northeastern's claim is brought under a product liability theory and because the Act is silent on the issue, we will not enforce the limitation of liability provision.

### CONCLUSION

The trial court correctly denied McGraw-Edison's motion for partial summary judgment. Based on the foregoing, the trial court is affirmed.

KIRSCH and NAJAM, JJ., concur.